## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **EDWARD J. COPE,** | : **NO.:** |
| **Plaintiff** | : **Judge:** |
| | : |
| **v.** | : **CIVIL ACTION - LAW** |
| | : |
| **GRETCHEN BROSIUS;** | : **JURY TRIAL DEMANDED** |
| **TIMOTHY A. FINK;** | : |
| **CLIFFORD L. KRINER;** | : |
| **LEONARD ZBORAY;** | : |
| **GREGORY CARL;** | : **(Electronically Filed)** |
| **BOROUGH OF NORTHUMBERLAND,** | : |
| **PENNSYLVANIA;** | : |
| **NORTHUMBERLAND POLICE** | : |
| **OFFICERS' ASSOCIATION;** | : |
| **JOSHUA E. VANKIRK; and** | : |
| **POINT TOWNSHIP, PENNSYLVANIA;** | : |
| **Defendants** | : |

### COMPLAINT

**AND NOW** comes the Plaintiff, Edward J. Cope, by and through his undersigned counsel, and the law firm of Boyle, Autry & Murphy, and avers as follows:

### JURISDICTION

1.      This action is brought pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(1), (3), and (4).

3.      Venue is proper in this Court, as all parties are located within the

Middle District of Pennsylvania, and the cause of action arose in the Middle District of Pennsylvania.

## PARTIES

4.     Plaintiff, Edward J. Cope, is an adult individual, who, during all relevant times, was employed by the Northumberland Police Department, as a police officer.  Plaintiff Cope resides in Danville, PA 17821.

5.     Defendant, Gretchen Brosius, is an adult individual, who, during all relevant times, was employed as Mayor of the Borough of Northumberland, Pennsylvania.  Defendant Brosius' actions or inactions were taken under color of state law.  She is sued in her individual capacity.

6.     Defendant, Timothy A. Fink, is an adult individual, who, during all relevant times, was employed by the Northumberland Police Department as the Chief of Police.  Defendant Fink's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

7.     Defendant, Clifford L. Kriner, is an adult individual, who, during all relevant times, was employed by the Northumberland Police Department, as a police officer, with the rank of Sergeant.  Defendant Kriner's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

8.     Defendant, Leonard Zboray, is an adult individual, who, during all

relevant times, was employed as the Mayor of the Borough of Northumberland, Pennsylvania.  Defendant Zboray's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

9.      Defendant, Gregory Carl, is an adult individual, who, during all relevant times, was employed as Councilman of the Borough of Northumberland, Pennsylvania.  Defendant Carl's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

10.      Defendant, The Borough of Northumberland, Pennsylvania, is a political subdivision within the Commonwealth of Pennsylvania.  The Borough of Northumberland has a business address of 175 Orange Street, Northumberland, PA 17857.

11.      Defendant, Northumberland Police Officers' Association, is the exclusive bargaining representative for the law enforcement employees of the Defendant Borough. The Northumberland Police Officers' Association has a business address of 175 Orange Street, Northumberland, PA 17857.

12.      Defendant, Joshua E. VanKirk, is an adult individual, who, during all relevant times, was employed by the Point Township Police Department as the Chief of Police.  Defendant VanKirk's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

13.     Defendant, Point Township, Pennsylvania, is a political subdivision within the Commonwealth of Pennsylvania.   Point Township has a business address of 759 Ridge Road, Northumberland, PA 17857.

## FACTUAL BACKGROUND

### 2004: Plaintiff Appointed to Rank of Detective

14.     In September of 2004, Defendant Chief Fink was appointed Chief of Police.

15.     Pursuant to the police department rules and regulations, the police chief has the authority to assign a patrolman to detective division.

16.     Prior to the end of December of 2004, Defendant Chief Fink appointed Plaintiff Cope to the rank of Detective.

17.     The Defendant Borough issued Plaintiff Cope detective badges and business cards that identified him as detective of the Defendant Borough's police department.

18.     In the police department's database, Plaintiff Cope was identified as a detective.

19.     While serving as a detective, Plaintiff Cope worked in plain clothes and was generally removed from patrol responsibilities.

4

20.     In police reports, Defendant Chief Fink and other officers referred to Plaintiff Cope as a detective.

21.     While serving as a detective, Plaintiff Cope conducted criminal investigations for the police department.

22.     The Defendant Borough held Plaintiff Cope out to the public as a detective.

23.     The media referred to Plaintiff Cope as a detective.

### Plaintiff Cope's Commercial Property

24.     On November 21, 2008, Plaintiff Cope purchased a commercial property, located at 577 Duke Street, Northumberland, PA 17857, which was located next to a property owned by Defendant Mayor Brosius.

25.     On July 31, 2009, an architect completed plans for a hoagie shop that Plaintiff Cope intended to open on the property.

26.     In the fall of 2009, Defendant Mayor Brosius advised Plaintiff Cope that he would need to have a zoning hearing about the property, because the property was marketed incorrectly as a commercial property.

27.     Defendant Mayor Brosius' statement was false, as both the Borough and County tax records have the property listed as a commercial property.

28.     On October 21, 2009, Plaintiff Cope's attorney William Swinehart, wrote a letter to Paul Ruane, a codes enforcement officer for the Defendant Borough, who in turn forwarded the letter to Attorney Ryan Tira, the Solicitor for the Defendant Borough.

29.     In the letter, Attorney Swinehart explained that the property in question was a commercial property and that the intended commercial use had never been abandoned.

30.     On October 27, 2009, Solicitor Tira responded to the letter in writing and stated that the property could continue to be utilized as a garage but not as a hoagie shop.

31.     As a result of Defendant Mayor Brosius' threats and false statements, Plaintiff Cope incurred a loss of revenue.

### Unfair Labor Practice: Threat to Disband the Police Department

32.     In 2010, Plaintiff Cope served as the President of the Defendant Police Union.

33.     On February 9, 2010, during collective bargaining negotiations, the Defendant Borough threatened to disband the police department.

34.     In response, on February 24, 2010, Plaintiff Cope filed an unfair labor practice against the Defendant Borough.

35.    On March 16, 2010, Plaintiff Cope met with a reporter from The Daily Item, a local newspaper, about the Defendant Borough's threat to disband the police department.

36.    Several days later, the reporter published an article about the pending unfair labor practice.

37.    After the article was published, Defendant Mayor Brosius falsely accused Plaintiff Cope of providing the reporter with her cell phone number.

38.    Plaintiff Cope complained to Defendant Chief Fink, but Defendant Chief Fink refused to investigate who provided the number to the reporter.

### Plaintiff Cope Files Ethics and Criminal Complaints: Self-Dealing

39.    On February 26, 2010, Plaintiff Cope filed Ethics Complaints with the Pennsylvania Ethics Commission, against Defendant Mayor Brosius; her sister, Councilwoman Judith Groninger; and Councilman Jonathan Rees; regarding a billboard owned by the Defendant Borough.

40.    In the Ethics Complaint, Plaintiff Cope alleged that only two businesses that were associated with the aforementioned elected officials were permitted to advertise on the billboard; other businesses were excluded.

41.    On March 25, 2010, Plaintiff Cope filed complaints of criminal wrongdoing with the Pennsylvania State Police, against Defendant Mayor Brosius;

her sister, Councilwoman Judith Groninger; and Councilman Jonathan Rees; regarding the billboard.

**False Accusations Cause Plaintiff Cope to Resign as President of Police Union**

42.     On March 25, 2010, the previously identified reporter published an article in The Daily Item entitled, "Deals Sounds Alarm," which provided that the then Council President, Bryan Wolfe, was being investigated for embezzlement by members of the Pennsylvania State Police.

43.     It is believed and therefore averred that the source for the reporter's story was a search warrant that had been executed on March 10, 2010, by the State Police (which would have been a matter of public record).

44.     Shortly after the article was published, Defendant Mayor Brosius falsely told Defendant Chief Fink that Plaintiff Cope had leaked information about the State Police investigation to the reporter.

45.     Plaintiff Cope again demanded that Defendant Chief Fink conduct an investigation but Defendant Chief Fink again refused.

46.     On July 16, 2010, the aforementioned reporter published an article in The Daily Item, which provided that the former Borough Council President, Bryan Wolfe, was criminally charged with stealing $100K from his former employer and $18,000 from the Defendant Borough.

47.     On July 17, 2010, the aforementioned reporter published a third article in The Daily Item, which provided that the then wife of Bryan Wolfe, was quoted as saying, "We lived like the Rockefeller's."

48.     It is believed and therefore averred that the reporter's source for the information was the police criminal complaint filed against Bryan Wolfe (which would also have been a matter of public record).

49.     On July 19, 2010, Plaintiff Cope entered the police station and observed Defendant Chief Fink speaking with Defendant Mayor Brosius.

50.     Upon seeing Plaintiff Cope, Defendant Mayor Brosius became irate and stormed out of the station.

51.     Several days later, Defendant Chief Fink informed Plaintiff Cope that Defendant Mayor Brosius was upset because she believed that Plaintiff Cope had interviewed Bryan Wolfe's wife and had leaked her interview to the reporter.

52.     In April 2010, Plaintiff Cope resigned his position as the President of the Defendant Police Union, because the false statements and retaliatory actions from Defendant Mayor Brosius and Defendant Borough were negatively impacting his employment.

## Plaintiff Cope Reports False Arrest Committed by Defendant Kriner

53.    On April 22, 2010, Donald A. Paul, of Dauphin County, Pennsylvania, contacted the Northumberland Police Department.

54.    Paul stated that he was undergoing a background check for his church and had discovered that someone was falsely using his name in Northumberland County.

55.    Paul stated that his name was on a public website falsely stating that he had been arrested in Northumberland County for felony drug charges.

56.    Plaintiff Cope advised Paul that he would investigate the matter.

57.    Plaintiff Cope discovered that that on April 17, 2003, Defendant Kriner arrested Donald E. Paul but incorrectly filed felony drug charges against Donald A. Paul.

58.    When Defendant Kriner discovered that he had incorrectly charged Donald A. Paul, he falsified his report and deleted all information regarding Donald A. Paul from the police database.

59.    Plaintiff Cope advised Defendant Chief Fink of his discovery.

60.    Defendant Chief Fink discussed the matter with Defendant Chief VanKirk.

61.    Defendant Chief Fink then advised Plaintiff Cope that "Josh said it's too old to do anything with."

62.    Defendant Chief Fink then ordered Defendant Kriner to have the arrest information expunged.

63.    To date, the felony drug charges against Donald A. Paul are still on the public website and have not been expunged.

64.    Moreover, Defendant Chief Fink has not initiated disciplinary proceedings actions against Defendant Kriner.

**Defendant Mayor Brosius: New Police Department: Detective Division**

65.    In August of 2010, the Defendant Borough moved the police department and municipal offices to a building known locally as "The Second Street School" at 175 Orange Street.

66.    The police department was temporarily placed on the first floor of the north end of the building.

67.    Defendant Mayor Brosius was the head of a committee tasked with deciding how to renovate the building.

68.    The Defendant Borough employed the services of Architect Gary Wolfe to draw up plans for a permanent police station that would be located in the basement on the south end of the building.

69.   The draft plans that came out of Defendant Mayor Brosius' committee included an office for the detective.

### Plaintiff Cope Demoted From Detective to Patrolman

70.   Since 1991, the Northumberland Police Department has had a practice of reimbursing police officers for reasonable costs associated with out of town travel.

71.   On November 10, 2010, Plaintiff Cope was scheduled to be in Scranton, Pennsylvania, to conduct a criminal investigation.

72.   Upon his return, he turned in a receipt for his lunch for reimbursement.

73.   Defendant Chief Fink told Plaintiff Cope that some officials of the Defendant Borough were upset that Plaintiff Cope had submitted a reimbursement request for his meal.

74.   Plaintiff Cope showed Defendant Chief Fink that rule 700.5 in the Department Rules and Regulations authorized a detective to submit receipts for reimbursement related to out of town travel.

75.   On November 30, 2010, Defendant Mayor Brosius issued a Memorandum, which provided that the Defendant Borough had never acted to establish a detective division for the Northumberland Police Department.

76.     The Memorandum further provided that no police officer should identify themselves as a detective.

77.     Furthermore, the Memorandum provided that except for court appearances, no police officer should appear for work in plain clothes.

78.     As a result, Defendant Chief Fink advised Plaintiff Cope that effective January 1, 2011, he would be returned to patrol.

79.     When Plaintiff Cope asked Defendant Chief Fink about how drug investigations would be conducted in light of the Memorandum's stated ban on working in plain clothes, he stated that, "We aren't going to follow that part."

80.     After the Memorandum was issued, certain police officers came to work in plain clothes.

81.     When Plaintiff Cope asked the police officers about the Memorandum, they stated that they had never seen the Memorandum.

82.     On December 9, 2010, Defendant Mayor Brosius confronted Plaintiff Cope about his meal reimbursement request.

83.     Plaintiff Cope told Defendant Mayor Brosius that her November 30, 2010, Memorandum, which provided that there was no detective division, was not correct, as the police department's rules and regulations that had been adopted by the Defendant Borough referenced a detective division.

84.     Defendant Mayor Brosius stated, "You mean the rules from the 70s."

85.     Plaintiff Cope asked Defendant Mayor Brosius if she was contending that the police department did not have rules or regulations.

86.     Defendant Mayor Brosius stated, "That's not what I'm saying."

87.     On January 7, 2011, a local radio station and newspaper reported that Defendant Cope was demoted and no longer a detective.

### Defendant Kriner: Falsified Log

88.     On January 8, 2011, Defendant Kriner and Defendant Carl, the then President of Northumberland Borough Council, had a six hour meeting in the police station.

89.     Defendant Kriner then falsified his log sheet to indicate that during the same period of time, he was conducting an interview and performing administrative duties.

### Unfair Labor Practice: Demotion

90.     On or about January 11, 2011, Plaintiff Cope filed an unfair labor practice regarding his demotion from the rank of detective to patrol.

91.     On March 15, 2012, the Police Union held a meeting but did not invite Plaintiff Cope to attend the meeting.

92.     During the meeting, the Defendant Police Union executed a two page "Settlement Agreement" with the Defendant Borough, regarding the unfair labor practice, which provided that the Settlement Agreement had an effective date of October 30, 2011.

93.     The settlement agreement was signed by Defendant Carl who represented the Defendant Borough.

94.     Prior to executing the Settlement Agreement, the Defendant Police Union never consulted with Plaintiff Cope about the unfair labor practice or any proposed settlement.

95.     On March 21, 2011, Plaintiff Cope wrote a letter to Matthew Lauver, president of the Police Union, in which he requested representation in the unfair labor practice matter.

96.     Plaintiff Cope advised Lauver that he intended to proceed with the unfair labor practice hearing scheduled for April 1, 2011, before the Pennsylvania Labor Relations Board, in Harrisburg, Pennsylvania.

97.     Matthew Lauver and/or the Defendant Police Union never responded or took any action on Plaintiff Cope's request for representation.

98.     On March 24, 2011, Defendant Kriner conducted a private meeting, in executive session, with the Northumberland Borough Council.

99.    It is believed and therefore averred that Defendant Kriner used this meeting to try to discredit Plaintiff Cope, since Plaintiff Cope had documentation to substantiate his claims before the Pennsylvania Labor Relations Board.

100.    When Plaintiff Cope inquired of Defendant Chief Fink about Defendant Kriner's private meeting in executive session with the Borough Council, Defendant Chief Fink stated that Defendant Kriner met with Borough Council as a member of the Defendant Police Union.

101.    Plaintiff Cope advised Defendant Chief Fink that he was also a member of the Defendant Police Union but that he was not advised of the March 24, 2011, meeting or provided with an opportunity to attend.

102.    Defendant Chief Fink did not respond.

## Letter from Plaintiff Cope to Defendant Chief Fink

103.    On May 3, 2011, Plaintiff Cope wrote a letter to Defendant Chief Fink, complaining generally about matters of public concern, specifically acts of waste and wrongdoing (discussed further below) committed by Defendant Kriner.

104.    The original document was provided to Defendant Chief Fink, with a copy provided to the President Pro-tem of Northumberland Borough Council, who was acting in the capacity of President due to the absence of the President and Vice-President of Council.

## New Chain of Command

105.  On May 18, 2011, Defendant Chief Fink issued a memorandum, which provided that with respect to chain-of-command, the Mayor was next in line after Defendant Chief Fink; not the council for the Defendant Borough.

106.  Defendant Chief Fink's memorandum concerning the proper chain-of-command was issued to all police officers of the Northumberland Police Department.

107.  On September 16, 2011, Defendant Chief Fink advised Plaintiff Cope that the May 18, 2011, "chain-of-command letter" was going to be placed in his personnel file only.

108.  As a result, Plaintiff Cope filed a step-1 grievance with the Mayor, who stated in response that the letter would stay in Plaintiff Cope's file.

109.  On September 27, 2011, Plaintiff Cope filed a Step-2 grievance with the council for the Defendant Borough requesting that the letter be removed from his personnel file.

110.  Pursuant to the collective bargaining agreement, the council for the Defendant Borough was required to meet with Plaintiff Cope within 30 days and to issue a response within 10 days of said meeting.

111.   The Defendant Borough however, failed to conduct the required meeting or to issue the required timely response.

112.   Pursuant to the collective bargaining agreement, due to the Defendant Borough's failure to timely act as required, the grievance should have been resolved in favor of the grievant.

113.   In 2012, the letter in question was removed from Plaintiff Cope's personnel file.

## **Defendant Mayor Brosius Resigns: Harassment Continues**

114.   On July 1, 2011, Defendant Mayor Brosius resigned as Mayor of Defendant Borough.

115.   On August 8, 2011, an independent inspector issued an occupancy permit for a commercial garage to be operated on a portion of Plaintiff's commercial property.

116.   When Defendant Mayor Brosius learned that the garage would be rented, she personally contacted code enforcement officer Ruane and told him that the occupancy permit should not have been issued because a garage was not a permitted use.

117.   Defendant Mayor Brosius further threatened to file a complaint with the Northumberland Zoning Board, which is the same entity where her husband, Earl Eugene Brosius, is the solicitor.

118.   Defendant Mayor Brosius did not follow through on her threat.

### New Mayor: New Policies

119.   On July 19, 2011, Defendant Mayor Leonard Zboray was appointed Mayor of Defendant Borough.

120.   On August 1, 2011, Defendant Chief Fink placed a large 3-ring binder on the window sill where the department policies were generally kept.

121.   The 3-ring binder contained new police department policies with an effective date of August 1, 2011.

122.   The new policies were created from a disc that Defendant Chief Fink had purchased from the Pennsylvania Police Chiefs' Association.

123.   On August 10, 2011, Defendant Kriner wrote an email to all personnel in which he stated that with respect to the new policies, the new department forms obtained from the Pennsylvania Police Chiefs' Association (with a revision date of March of 2010) were to be utilized.

124.   On October 18, 2011, the Police Union wrote a letter to Defendant Mayor Zboray, stating that they had concerns about the policies dated August 1,

2011, because many of the polices did not fit the Northumberland Police Department and the policies were never adopted by Northumberland Borough Council.

125.   On October 18, 2011, Defendant Chief Fink issued a "Department Memorandum" in which he stated that the policies dated August 1, 2011, were not in effect and that the "Previous policy manual is in effect until such time the new policies are approved."

## The Hush Order

126.   On October 24, 2011, Defendants Chief Fink and Kriner, with the assistance of Defendant Police Chief Joshua VanKirk of the Point Township Police Department, issued a hush order, which provided that that police personnel were not to disclose any information to anyone, including elected officials.

127.   Defendant Chief Fink advised Plaintiff Cope that he had received advice and a draft hush order from Defendant Chief VanKirk.

128.   Defendant Chief Fink told Plaintiff Cope that the hush order was issued "Because you are going to go to a meet with Council after the first of the year and I don't want you taking any reports along."

129.   Subsequently, Defendant Kriner advised Plaintiff Cope that he had drafted the hush order in question.

130.   The hush order resulted in the silencing of at least one police officer who had intended to speak with the council for the Defendant Borough about matters of public concern.

## The Hiring of Officer Kevin Rushton

131.   On November 27, 2011, the Defendant Police Union conducted a meeting to vote on whether to agree to a certain salary and other concessions for 2012, so that Defendants Mayor Zboray, Chief Fink and Kriner, could recommend the hiring of a part-time officer, Kevin Rushton, full-time.

132.   Plaintiff Cope voted no.

133.   During the union meeting, Defendant Kriner began yelling loudly at Plaintiff Cope that, "You need mental health help. You are sick."

134.   On December 4, 2011, Plaintiff Cope met with Defendants Mayor Zboray, Chief Fink and Kriner, regarding the anticipated hiring of Rushton full-time.

135.   During the meeting, Plaintiff Cope provided Defendant Mayor Zboray with a copy of the U.S. Supreme Court case of Brady v. Maryland, along with articles from police magazines that discussed "Brady Cops."

136.   Plaintiff Cope handed Defendant Mayor Zboray the paperwork and advised Defendant Mayor Zboray that Rushton should not be hired because he is a "Brady Cop."

137.   As soon as Defendant Mayor Zboray received the paperwork and without first reviewing the paperwork, Defendant Mayor Zboray stated, "He's not a Brady Cop."

138.   Plaintiff Cope advised Defendants Mayor Zboray, Chief Fink and Kriner that Rushton had previously committed perjury.

139.   Plaintiff Cope told Defendants Mayor Zboray, Chief Fink and Kriner that this information was not disclosed by Rushton during his background check as required.

140.   Rather, Rushton disclosed this information during a pre-polygraph questionnaire for a background check performed by another law enforcement agency.

141.   Plaintiff Cope advised Defendants Mayor Zboray, Chief Fink and Kriner that they had an obligation to the public to investigate this information.

142.   Defendant Mayor Zboray said, "Well, he made a mistake when he was younger."

143.   Defendant Mayor Zboray further stated that he needed to hire Rushton or Defendant Chief VanKirk was "Going to steal him away."

144.   Plaintiff Cope advised the aforementioned Defendants that they should not be withholding information from council for the Defendant Borough; especially since Council ultimately decides who is hired and since this information could potentially expose the Defendant Borough to liability.

## The Taser Incident

145.   On December 16, 2011, off-duty part-time patrol officer, Kelly Fisher, also a college professor, was at the police department supervising a college intern with the police department.

146.   Plaintiff Cope participated in a Taser training seminar with Fisher and other police officers where the intern was voluntarily Tasered.

147.   Subsequently, Defendant Chief Fink initiated an investigation into the Taser incident to determine if any department policy was violated.

148.   Fisher advised Point Township Police Officer Wade Lytle, who participated in the training session, "They're going after Cope."

149.   In or around late 2011 or early 2012, Officer Lytle advised Defendant Chief VanKirk that, "The only reason that they are going after Cope is because he is going to go to council and your buddy (Chief Fink) may lose his job."

23

150.   Defendant Chief VanKirk agreed.

151.   Defendant Chief VanKirk cleared Officer Lytle of any wrongdoing in the Taser incident.

152.   Shortly thereafter, Defendant Chief VanKirk ordered Officer Lytle to provide a written statement about the Taser incident and told him that the statement would stay within the Point Township Police Department.

153.   Defendant Chief VanKirk then provided Defendant Chief Fink with a copy of the statement.

### Department of Labor Complaint: Inspection of Personnel File

154.   On December 27, 2011, Plaintiff Cope requested to examine his personnel file.

155.   At the time, the Defendant Borough did not have a policy regarding the viewing of personnel files.

156.   Plaintiff was advised by the Defendant Borough's Secretary that he could only examine his personnel file if either Defendants Chief Fink or Mayor Zboray were present.

157.   Plaintiff Cope explained that he had a legal right to examine his personnel file.

158.   He was advised that Solicitor Tira would be consulted.

24

159.   The Defendant Borough, however, failed to contact Plaintiff Cope to advise him that he would be permitted to inspect his personnel file.

160.   On December 28, 2011, Plaintiff Cope filed a complaint with the Pennsylvania Department of Labor regarding the Defendant Borough's refusal to permit him to inspect his personnel file.

161.   The Department of Labor scheduled a telephone conference with Solicitor Tira and Plaintiff Cope, during which time it was agreed that Plaintiff Cope would be permitted to view his personnel file.

### Letter: Waste and Wrongdoing

162.   On January 3, 2012, Plaintiff Cope requested to meet with council for the Defendant Borough regarding matters of public concern, specifically, waste and wrongdoing committed by Defendants Chief Fink and Kriner.

163.   Council, however, advised Plaintiff Cope that he would have to meet with Defendant Mayor Zboray, who was friendly with and protected Defendants Chief Fink and Kriner.

164.   On or about January 5, 2012, while Plaintiff Cope was on station, Defendant Kriner smiled, laughed, and stated, "Hey Ed, turn off the lights when you go out," making it evident to Plaintiff Cope that he was aware of Plaintiff Cope's complaint of waste and wrongdoing.

165.   On January 30, 2012, Plaintiff Cope sent Defendant Mayor Zboray a letter advising Defendant Mayor Zboray generally of the following acts of waste and wrongdoing:

    a.   The police department received designated funds from the Seiple Foundation, a charitable trust, to purchase certain equipment, which Defendant Chief Fink purchased but would not use.  For safety and security reasons, the equipment is not identified in this Complaint but will be identified for an *in camera* inspection if directed by the Court to do so.

    b.   Similarly, Defendant Chief Fink used public monies to purchase equipment and supplies that he would not use.  Again, for safety and security reasons, the equipment and supplies are not identified in this Complaint but will be identified for an *in camera* inspection if directed by the Court to do so.

    c.   Defendant Chief Fink received notice of a Ford manufacturer recall regarding the paint used on patrol vehicles but failed to properly handle the recall notices, which resulted in the Defendant Borough having to pay for the recall work to be performed.

    d.   Defendant Chief Fink placed policies and procedures into effect without the approval of Northumberland Borough Council.

    e.   Defendant Chief Fink refused to update the vehicle pursuit policy, provide the policy or training on the policy to certain police officers, and permitted police officers to violate the policy.

    f.   Defendant Kriner falsified an official police report to cover up the fact that he had arrested and jailed a person on felony criminal charges using someone else's name. When Defendant Chief Fink ordered Defendant Kriner to arrange for the person's record to be expunged he failed to do so.  Defendant Chief Fink did not initiate disciplinary proceedings against Defendant Kriner.

26

g. Defendant Kriner is the Chairman of the Legal Aid for the Susquehanna Valley Fraternal Order of Police (FOP) Lodge 52. Sergeant Kriner has conducted FOP business while on duty and being paid by the Defendant Borough. Defendant Kriner falsified several daily field activity reports to cover up this unlawful conduct.  In at least one instance, it is believed and therefore averred that Defendant Kriner conducted FOP business out of town instead of investigating a sexual assault perpetrated against a minor.  Defendant Chief Fink has failed to initiate disciplinary proceedings against him.

h. Defendant Kriner, while on duty, traveled in plain clothes to the Watsontown Police Department, under the guise of conducting a background check on an individual that he wanted to hire part-time. The Defendant Borough, however, did not extend an offer of employment to the person and did not direct that a background investigation be conducted.

i. Defendant Kriner refused to arrest an individual who had crashed his vehicle while driving under the influence of alcohol to the point that the person was impaired and incapable of safe driving ("DUI"). Instead, the vehicle was towed from the scene and Defendant Kriner arranged for a ride home for the individual.

j. Defendants Chief Fink and Kriner knew that an individual with a prior DUI conviction was arrested, that lab results indicated that the individual was DUI, and that no criminal charges were filed.

166.   In his letter to Defendant Mayor Zboray, Plaintiff Cope requested permission to schedule a meeting with the Defendant Borough and advised that he would wait until February 6, 2012, before doing so.

167.   The Defendant Borough denied Plaintiff Cope's request for a meeting.

27

## Street Department Banned from the Police Department

168.   On February 6, 2012, Officer Lauver filed a police report after receiving a complaint from Todd Snyder, an employee of the Defendant Borough's street department, regarding an air compressor (or an electric generator) and other items that he had turned into the police station but that were never returned to him.

169.   On February 7, 2012, Defendant Chief Fink reviewed the police report and then issued an order that provided that the police department's trash would be collected by police personnel and placed outside the police station, and that Snyder and other street department employees were no longer permitted to enter the police station.

170.   The street department foreman, however, who is friends with Defendant Chief Fink, had a key to enter all areas of the police department and was not banned from entering the police station.

## Letter of Charges: Defendant Chief Fink's Fabricated Policy

171.   On February 28, 2012, Defendant Mayor Zboray issued a "Letter of Charges," which provided that Plaintiff Cope violated the "Taser Training Policy" and that his conduct constituted Conduct Unbecoming of an Officer.

172.   The "Taser Training Policy," however, did not exist.

173.   Rather, the document to which Defendant Chief Fink referred was a Taser International release from liability form in which Taser directed all police departments to adopt a Taser policy.

174.   In this regard, Defendant Chief Fink provided Councilman Adam Klock with a fabricated Use of Force Policy dated June 16, 2005.

175.   The 2005 Use of Force Policy provided by Defendant Chief Fink was a policy created by the Pennsylvania Chiefs of Police Association in March of 2010.

176.   Several days later, Councilman Klock asked Defendant Chief Fink to provide him with proof that every police officer had received the policy.

177.   In response, Defendant Chief Fink provided produced Councilman Klock with a form containing Plaintiff Cope's forged signature (and presumably other forged signatures).

178.   There is no reference in any of the Defendant Borough's council meetings of the falsified policy ever being adopted.

### **Request for Union Representation**

179.   On March 12, 2012, at the request of Plaintiff Cope, the Defendant Police Union conducted a meeting.

180.   During the meeting, Plaintiff Cope requested that the Defendant Union represent him regarding the discipline letter that he received regarding the Taser incident.

181.   On March 12, 2012, Plaintiff Cope received a copy of a rebuttal letter authored by Kelly Fisher about the Taser incident in which Fisher blamed the entire incident on Plaintiff Cope.

## Grievance: Defendant Mayor Zboray's Warning Letter

182.   On March 15, 2012, Plaintiff Cope filed a Step-1 grievance regarding the February 28, 2012, warning letter issued by Defendant Mayor Zboray.

183.   Since Defendant Mayor Zboray issued the letter (instead of Defendant Chief Fink), Plaintiff Cope lost a level of appeal because he was forced to appeal the letter to Defendant Mayor Zboray.

184.   Not surprisingly, on March 16, 2012, Defendant Mayor Zboray denied Plaintiff Cope's Step-1 grievance and decided that the warning letter would remain in Plaintiff Cope's personnel file.

185.   On March 23, 2012, Plaintiff Cope filed a Step-2 grievance with Borough Council to request that the letter be removed from his personnel file.

186.   On April 17, 2012, Plaintiff Cope met with council for the Defendant Borough regarding his Step 2 grievance.

187.   Prior to the meeting, however, Plaintiff Cope was not advised that the meeting was a hearing or that he had a right to a public hearing.

188.   After meeting with Plaintiff Cope in executive session, council for the Defendant Borough reconvened its public meeting but failed to publically vote on Plaintiff Cope's grievance.

189.   On April 27, 2012, Plaintiff Cope received a written response from President Troup, advising him that his Step 2 grievance was denied and that the letter would be placed in his personnel file.

190.   On May 2, 2012, Plaintiff Cope made a right-to-know request for the minutes of the April 17, 2012, public meeting.

191.   Approximately one week later, Plaintiff Cope received a certified copy of the minutes.

192.   The minutes establish that in violation of the Pennsylvania Sunshine Law, council for the Defendant Borough did not take a public vote on Plaintiff's Step 2 grievance.

193.   On May 8, 2012, Plaintiff filed for Step 3 arbitration, and on May 23, 2012, he filed a Complaint in Northumberland County Court of Common Pleas, asserting a violation of the Pennsylvania Sunshine Law.

## The Defendant Borough's "Independent Investigation"

194.   In early April of 2012, Defendant Mayor Zboray posted a training schedule that required Plaintiff Cope to attend training on April 10, 2012, at 12:00 PM.

195.   Defendant Mayor Zboray said that the "training" would take place in council chambers at Borough Hall.

196.   Plaintiff Cope reported for the "training" as scheduled only to discover that no training program was to be provided.

197.   Rather, Plaintiff Cope was met by Larry Forletta, a private investigator with FCIS, a private detective agency based in Pittsburgh, Pennsylvania.

198.   A second private investigator was also present.

199.   Plaintiff Cope met with the private investigators, at their request, for approximately five hours, providing documentation of the aforementioned waste and wrongdoing committed by Defendants Chief Fink and Kriner.

200.   Other members of the police department where scheduled after Plaintiff Cope but Defendant Mayor Zboray advised them that they would have to be rescheduled.

201.   On April 11, 2012, Plaintiff Cope reported for duty and Officer Lauver stated that he had heard that Plaintiff Cope had met with private investigators for five hours.

## After Meeting with Investigators Harassment of Plaintiff Cope Intensifies

202.   In April of 2012, a false child abuse report was filed by a "mandatory reporter" with the Northumberland County Children and Youth Services against Plaintiff Cope and his wife.

203.   In April of 2012, after Patrolman Rushton saw Plaintiff Cope speaking with an adult female, a false rumor was disseminated that Plaintiff Cope was having an affair.

204.   In April of 2012, an anonymous false complaint was filed with the Pennsylvania State Police regarding Plaintiff Cope using secure police computers and disseminating information to his friends.

205.   On July 11, 2012, Plaintiff Cope was approached by a Corporal from the Hollidaysburg Station of the Pennsylvania State Police.

206.   The Corporal stated that he investigates misuse of the Commonwealth Law Enforcement Assistance Network (CLEAN).

207.   The Corporal stated that in April of 2012, his agency had received an anonymous complaint that Plaintiff Cope had checked a vehicle registration for a friend.

208.   The Corporal asked if Plaintiff Cope had used the CLEAN system to try to locate a friend for a high school reunion.

209.   Plaintiff Cope told the Corporal that he had looked up a name in JNET, but that the address was old and he did not disseminate any information to anyone.

210.   The Corporal agreed that Plaintiff Cope had not violated the law and stated, "I don't know what is going on around here, but someone has it out for you."

211.   Coincidentally, in November of 2011, Defendant Kriner had discussed the high school class reunion and the fact that most the classmates had been located.

212.   It is believed and therefore averred that Defendant Kriner filed the anonymous false complaint.

**Plaintiff Cope Meets with Point Township Supervisor Montie Peters**

213.   The Point Township Police Department is the recipient of federal funds, which include, but may not be limited to, overtime grant funds for enforcement of laws pursuant to a traffic safety grant.

214.   Defendant Chief Fink is responsible for managing the federal money allocated to the Point Township Police Department.

215.   In 2010, Lynda Schlegel Culver was a Republican candidate for Pennsylvania State Representative of the 108th District of the Pennsylvania House of Representatives.

216.   Defendant Chief Fink ordered all police officers employed by the Point Township Police Department to report to the police station in full uniform.

217.   Defendant Chief Fink had the police officers and himself photographed with candidate Culver in full uniform regardless of their political affiliation.

218.   Subsequently, a full page colored campaign advertisement featuring the photograph of the Point Township Police Department with candidate Culver was mailed by candidate Culver and/or her election committee to perspective voters.

219.   Similarly, a full page colored campaign advertisement featuring a photograph of Defendant Chief Fink sitting in a marked patrol vehicle, in full uniform, was mailed by candidate Culver and/or her election committee to perspective voters.

220.   On April 15, 2012, Plaintiff Cope met with Montie Peters, an elected Supervisor with the Point Township Board of Supervisors.

221.   Plaintiff Cope showed Peters the hush order that was issued by Defendant Chief Fink and Defendant Kriner.

222.   Plaintiff Cope advised Peters that the hush order was received by Defendant Chief Fink and Defendant Kriner from Defendant Chief VanKirk.

223.   Plaintiff Cope told Peters that the hush order was issued for the purpose of intimidating Plaintiff Cope and preventing him from reporting waste and wrongdoing to the Defendant Borough.

224.   Plaintiff Cope advised Peters that Defendant Chief VanKirk was actively participating with Defendants Chief Fink and Kriner in unethical and possibly unlawful conduct.

225.   Plaintiff Cope showed Peters a Pennsylvania Chiefs of Police Association form that Defendant Chief VanKirk would have signed in which the signatory promised not to disseminate, share, or otherwise provide information

contained on a disc obtained from the Association to anyone, regardless of whether or not the signatory had purchased the disc.

226.   Plaintiff Cope informed Peters that Defendant Chief VanKirk provided a thumb drive to Defendants Chief Fink and Kriner containing policies that VanKirk had prepared using templates obtained from the Association's disc.

227.   Plaintiff Cope informed Peters that the policies were backdated by someone to make it appear that the Defendant Borough's police department had implemented the policy in 2005.

228.   Plaintiff Cope further informed Peters that Defendant Chief VanKirk was an active participant in meetings with Defendants Chief Fink Kriner regarding the policy in question.

229.   Plaintiff Cope advised Peters that Defendant Chief Fink disclosed Plaintiff Cope's confidential personnel information to Defendant Chief VanKirk.

230.   Plaintiff Cope informed Peters that Defendant Chief VanKirk was essentially running both the Point Township Police Department and the Northumberland Police Department.

231.   Plaintiff Cope informed Peters that he should speak with his patrol officers who shared similar concerns but who were ordered by Defendant Chief not to speak with elected officials.

232.   Several days later, Peters met with Defendant Chief VanKirk to speak about the concerns raised by Plaintiff Cope.

233.   Right after the meeting, Defendant Chief VanKirk commented to Officer Lytle that "I am going to go after him for meeting with Montie."

234.   On November 14, 2012, Plaintiff Cope filed a complaint with the Hatch Act Unit of the Office of Special Counsel, located in Washington D.C, seeking Defendant Chief Fink's removal from office.

## The Posting in the Locker Room

235.   Plaintiff Cope's locker is located next to Officer Rushton, the officer who he suggested should not be hired.

236.   In May of 2012, Officer Rushton taped a training certificate on the front of his locker in the locker room, which identified Rushton as Det. Kevin Rushton, Northumberland County District Attorney's Office.

237.   It is believed and therefore averred that the certificate identifying Rushton as Detective was taped to his locker to harass or intimidate Plaintiff Cope.

238.   Defendant Kriner has a locker directly across from Rushton in the lock room, has seen the certificate taped to Ruston's locker, but has failed to take action to end the obvious harassment.

239.   On June 1, 2012, Plaintiff Cope reported for duty at 7:00 PM.

38

240.   Defendant Kriner had worked the prior shift.

241.   Prior to leaving, Defendant Kriner went into the public restroom in the police department.

242.   At approximately 7:40 PM, Plaintiff Cope went into the restroom and found an article from the Daily Item website taped to the wall.

243.   The article was published May 24, 2012, and discussed the Taser incident.

244.   The same article was taped to a filing cabinet next to a computer desk used by Defendant Kriner.

245.   It was clear to Plaintiff Cope that the article was posted in the public restroom to harass or intimidate Plaintiff Cope.

246.   Plaintiff Cope notified Defendant Mayor Zboray who later stated that he saw the article posted and notified Defendant Chief Fink.

247.   Defendant Kriner worked the next shift, used the restroom, and clearly knew that the article was still posted.

248.   On June 3, 2012, Plaintiff Cope took down the article.

### The Street Department's Right to Know Request

249.   On May 23, 2012, Todd Snyder, from the Defendant Borough street department filed a right-to-know request with the Defendant Borough asking for

the memorandum that Defendant Chief Fink had issued to his officers banning Snyder from the police station.

250.   On June 1, 2012, the Defendant Borough responded to Snyder's right-to-know request by stating that Defendant Chief Fink did not have a copy of the memorandum issued to the police officers concerning the office trash being placed outside.

251.   On June 29, 2012, Snyder again filed the right-to-know request with the Defendant Borough asking for the memorandum Defendant Chief Fink issued to his officers banning Snyder from the police station.

252.   On July 9, 2012, the Defendant Borough again responded to Snyder's right-to-know request by stating that Defendant Chief Fink did not have a copy of the memorandum issued to the police officers concerning the office trash being placed outside.

253.   On July 23, 2012, Snyder appealed the denial to the Pennsylvania Office of Open Records, located in Harrisburg, Pennsylvania.

254.   After Snyder filed his appeal, Borough Councilman Ty Sees asked Plaintiff Cope to provide him with a copy of the memorandum in question.

255.   Plaintiff Cope provided Councilman Sees with a copy of the memorandum.

256.   Councilman Sees provided the memorandum to Snyder.

257.   On July 24, 2012, Snyder wrote a letter to the Defendant Borough to advise the Defendant Borough that he had obtained a copy of the memorandum that the Defendants Borough and Chief Fink had stated did not exist, and requested that a criminal investigation be conducted.

258.   On August 3, 2012, Solicitor Tira drafted a letter to the Office of Pennsylvania Open Records in which he stated that Snyder's appeal should be dismissed because he had been provided with the document in question.

**Defendant Borough: "Independent Investigation" Concludes no Wrongdoing**

259.   On May 9, 2012, Plaintiff Cope met with the private investigators from FCIS again at their request.

260.   On August 17, 2012, at the request of the Defendant Borough, Plaintiff Cope met with Defendant Mayor Zboray and James Troup, president of the Defendant Borough's council, about an unrelated matter.

261.   During the meeting, Defendant Zboray handed Plaintiff Cope a letter signed by Troup and himself.

262.   The letter provided that the independent investigation had concluded that the Defendant Borough had not committed waste or wrongdoing.

263.   Plaintiff Cope questioned Troup about some of the issues that he had discussed with the private investigators and President Troup stated, "I was not aware of that."

264.   Plaintiff Cope advised Defendant Mayor Zboray that he was skeptical about the independence of the private investigation, since Defendant Mayor Zboray was in charge of it.

265.   Plaintiff Cope told Defendant Mayor Zboray that he felt that Defendant Mayor Zboray had leaked information to other members of the police department about the private investigators.

266.   Plaintiff Cope told Defendant Mayor Zboray that upon reporting for duty the next morning, Officer Lauver knew that Plaintiff Cope had met with the private investigators for five hours.

267.   Plaintiff Cope told Defendant Zboray that he felt that he was the one who had leaked the information to Patrolman Lauver about the length of his meeting.

268.   Defendant Mayor Zboray raised his eyebrows at Plaintiff Cope but did not respond further.

269.   It is averred that Defendant Mayor Zboray was responsible for leaking information to other members of the police department about Plaintiff Cope's interaction with the private investigators.

270.   Plaintiff Cope told Troup that that is why the Defendant Borough should have met with him directly.

271.   Plaintiff Cope asked Defendant Mayor Zboray about the fact that Defendant Chief Fink had lied about the right-to-know request filed by Snyder.

272.   Defendant Mayor Zboray said "We looked high and low and couldn't find it."

273.   Plaintiff Cope advised Defendant Mayor Zboray that the memorandum was generated on a computer.

274.   Defendant Zboray stated, "We looked. I don't think it was there."

275.   Defendant Zboray then stated, "What's the big deal?"

276.   Plaintiff Cope advised Defendant Zboray that an official request was submitted for the memorandum and Defendant Chief Fink lied and concealed the whereabouts of the memorandum, which is a criminal offense.

## COUNT I

**Plaintiff v. Individual Police Defendants
First Amendment – Retaliation
Pursuant to 42 U.S.C. § 1983**

277.   Paragraphs 1- 276 are stated herein by reference.

278.   To establish a claim for First Amendment retaliation, a Plaintiff must show: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.,* 463 F.3d 285, 296 (3d Cir.2006) (citation omitted).

279.   Moreover, "[a] public employee's statement is protected . . . when, (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made." *Gorum v. Sessoms,* 561 F.3d 179, 185 (3d Cir.2009); *Connick v. Myers,* 461 U.S. 138, 146 (1983).

280.   Plaintiff Cope repeatedly spoke out about matters of public concern as a citizen and not pursuant to his official duties.

281.   Moreover, Plaintiff Cope engaged in constitutionally protected

44

activities.

282.   The Individual Defendants retaliated against Plaintiff Cope for both engaging in protected speech and protected activities.

283.   The retaliatory acts taken against Plaintiff Cope were sufficient to deter a person of ordinary firmness from exercising his constitutional rights.

284.   Such retaliation included but was not limited to interference with his business activities; false complaints that threatened his marriage, family, and employment; interference with his career advancement; and a demotion from the rank of detective.

285.   As a direct and proximate result of this retaliatory action, Plaintiff Cope suffered and will continue to suffer embarrassment, humiliation, financial harm, physical and psychological harm, and pain and suffering, some or all of which may be permanent.

286.   As a direct and proximate result of this retaliatory action, Plaintiff Cope has incurred attorneys' fees and other costs associated with his defense.

## COUNT II

### Plaintiff v. Individual Police Defendants
### Fourteenth Amendment – Procedural Due Process Violation
### Pursuant to 42 U.S.C. § 1983

287.   Paragraphs 1-286 are stated herein by reference.

288.   As a civil service employee, Plaintiff Cope has a property interest in his continued public employment at the same rank and status.

289.   He was deprived of this property interest without due process of law as guaranteed by the procedural due process protections in the Fourteenth Amendment.

290.   The Defendants did not have 'just cause' to demote Plaintiff Cope from the rank of detective, and did so without providing Plaintiff Cope with the requisite notice and hearing.

291.   Plaintiff Cope was deprived of a meaningful opportunity to be heard.

292.   The only process provided to Plaintiff Cope was a sham process.

293.   As a direct and proximate cause of the Defendants' actions, Plaintiff has suffered and will continue to suffer embarrassment, humiliation, emotional distress, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

294.   As a direct and proximate cause of the Defendants' actions, Plaintiff has incurred attorneys' fees and other costs.

## COUNT III

**Plaintiff v. Defendants Borough of Northumberland and Point Township
Fourth & Fourteenth Amendment—Municipal Liability
Pursuant to 42 U.S.C. § 1983**

295.   Paragraphs 1-294 are stated herein by reference.

296.   The Borough of Northumberland, Pennsylvania ("Borough") owns and operates the Northumberland Police Department, an agency of the Borough.

297.   Defendant, Point Township, Pennsylvania, ("Township") owns and operates the Point Township Police Department, an agency of the Township.

298.   The Borough and Township maintained policies, practices, and customs, which were the moving force that resulted in the Plaintiff's constitutional rights being violated.

299.   Moreover, the Borough and Township were on notice of a need for further training related to the issues discussed herein but failed to provide the training, which resulted in the Plaintiff's constitutional rights being violated.

300.   It is believed that the Borough and Township failed to implement a policy, enforce a policy, or train officers on the First Amendment rights of public employees.

301.   It is believed that the Borough and Township failed to implement a policy, enforce a policy, or train officers on how to handle or respond to

complaints of waste and wrongdoing.

302. It is believed that the Borough and Township failed to implement a policy, enforce a policy, or train officers on how to properly participate in the union grievance process.

303. It is believed that the Borough and Township failed to implement a policy, enforce a policy, or train officers on how to conduct internal affairs investigations.

304. It is believed that the Borough and Township failed to implement a policy, enforce a policy, or train officers on how to properly supervise or discipline police officers.

305. If it is ultimately determined that an internal affairs investigation occurred, it is believed that discovery will reveal that the investigation was triggered as a result of the instant litigation (so as to be a defense to the litigation), as opposed to when the Borough and Township first learned of the matters discussed herein.

306. It is believed that the Borough and Township failed to implement a policy, enforce a policy, or train officers on how to supervise a police department to ensure that proper policies and practices are implemented and followed.

307. As a direct and proximate result of the Borough's and Township's

policies and practices that caused the Plaintiff's constitutional injuries, Plaintiff has suffered and will continue to suffer embarrassment, humiliation, emotional distress, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

308.   Furthermore, as a direct and proximate result of the Borough's and Township's policies or practices, Plaintiff has incurred attorneys' fees and other costs.

## COUNT IV

### Plaintiff v. Defendant Police Union
### Pursuant to the National Labor Relations Act

309.   Paragraphs 1-308 are stated herein by reference.

310.   The Northumberland Police Officers' Association is the exclusive bargaining representative for the law enforcement employees of the Defendant Borough.

311.   "A union has a duty under § 9(a) of the National Labor Relations Act ("NLRA") to fairly represent its members." *Acosta v. Hovensa, LLC,* 2010 WL 695693, at *4 (D.V.I. Feb. 23, 2010) (citing *Yaca v. Sipes,* 386 U.S. 171, 177 (1967)).

312.   This duty arises out of the union-employee relationship and the LMRA, 29 U.S.C. §§ 158–159, which "creates and defines that relationship."

*Medlin v. Boeing Vertol Co.,* 620 F.2d 957, 961 (3d Cir.1980).

313.   A union breaches this duty of fair representation if its conduct towards an employee is '"arbitrary, discriminatory, or in bad faith."' *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67 (1991) (quoting *Yaca,* 386 U.S. at 190)).

314.   "A union acts in bad faith if it acts fraudulently, dishonestly or deceitfully." *St. Martine v. Keystone Freight Corp.,* 2012 WL 645931, at *6 (E.D.Pa. Feb. 28, 2012).

315.   The Defendant Police Union has a continuing duty to provide fair representation to Plaintiff Cope with respect to all union grievance issues.

316.   The Police Union, however, failed to provide Plaintiff Cope with representation and failed to enforce the terms of the collective bargaining unit against Defendant Borough.

317.   As a direct and proximate result of the Defendant Police Union's conduct, Plaintiff has suffered and will continue to suffer embarrassment, humiliation, emotional distress, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

318.   Furthermore, as a direct and proximate result of the Defendant Police Union's conduct, Plaintiff has incurred attorneys' fees and other costs.

**WHEREFORE**, Plaintiff, Edward J. Cope, respectfully requests the following relief:

A.     That the Court provide the Plaintiff with a jury trial;

B.     That judgment be entered in favor of the Plaintiff and against the Defendants;

C.     That the Court declare that the Defendants' actions violated the Plaintiff's constitutional rights;

D.     That the Court award the Plaintiff compensatory damages;

E.     That the Court award the Plaintiff punitive damages (except against the Borough and Township Defendants);

F.     That the Court award the Plaintiff reasonable attorney's fees and costs and interest; and

G.     That the Court award such other financial or equitable relief as is reasonable and just.

**BOYLE, AUTRY & MURPHY**

*/s/  Devon M. Jacob*
**Dennis E. Boyle, Esquire**
Supreme Court I.D. No. 49618

**Devon M. Jacob, Esquire**
Supreme Court I.D. No. 89182
**Travis S. Weber, Esquire**
Supreme Court I.D. No. 309319
4660 Trindle Road, Suite 200
Camp Hill, PA 17011

Phone: (717) 737-2430
Fax: (717 737-2452
Email: deboyle@dennisboylelaw.com
dmjacob@dennisboylelaw.com
tweber@dennisboylelaw.com

Dated: November 29, 2012